**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF GEORGIA AUGUSTA DIVISION**

| | | |
|---|---|---|
| HOLDEN BLACKWELL, | * | |
| | * | |
| Plaintiff, | * | |
| | * | CV 125-032 |
| v. | * | |
| | * | |
| CSX TRANSPORTATION, INC. | * | |
| | * | |
| Defendant. | * | |

**O R D E R**

Before the Court are Defendant's motion for summary judgment (Doc. 26), Plaintiff's motion for leave to file corrected exhibit (Doc. 42), and Plaintiff's motion for oral argument[1] (Doc. 44). For the following reasons, Defendant's motion for summary judgment is **GRANTED**, Plaintiff's motion for leave to file corrected exhibit declaration is **DENIED**, and Plaintiff's motion for oral arguments is **DENIED**.

## I. BACKGROUND

This case arises from Defendant CSX Transportation's ("CSX") termination of Plaintiff Holden Blackwell's employment. Blackwell claims CSX fired him in retaliation for engaging in activities protected by the Federal Railroad Safety Act ("FRSA"). (Doc. 1, at 3-8.) CSX states that it fired Blackwell after exercising its reasonable business judgment and concluding that he violated

[1] The motion has been fully briefed, so the Court finds oral arguments are not necessary. Accordingly, Plaintiff's motion for oral argument is **DENIED**. (Doc. 44.)

company policy and ethics codes prohibiting fraud, theft, and dishonesty. (Doc. 26-2, at 11.)

Blackwell worked as a trackman for CSX's engineering department from 2011 until his termination on April 26, 2024. (Doc. 26-2, at 1; Doc. 32, at 2; Doc. 1, at 3, 5.) He was a member of a union and worked on CSX's T8 System Production Team ("SPT") starting in August 2023. (Doc. 26-2, at 1; Doc. 32, at 2.) In January 2024, Taylor Busby replaced Scott McCarty as the SPT manager for T8 and Blackwell's supervisor, and Busby reported to Ronald Cato, the Director of Ties, Rails, and Service Teams. (Doc. 26-2, at 2; Doc. 32, at 2.)

When the SPT team is assigned to a new work location, the employees could sign up to move the work vehicles to the new location and receive overtime pay. (Doc. 26-2, at 2; Doc. 32, at 3.) An employee could sign up to be a "driver" of a work vehicle or a "follower." (Doc. 26-2, at 2; Doc. 32, at 3.) The follower would drive either their personal car or a different work vehicle, behind the driver to drop off the work vehicle at the new location. (Doc. 26-2, at 2; Doc. 32, at 3.) Both employees would then ride back together in the follower's vehicle. (Doc. 26-2, at 2; Doc. 32, at 3.)

The rules regarding moving vehicles for overtime pay are hotly contested. CSX states the followers were only permitted to drive their personal vehicle and not a work vehicle. (Doc. 26-2, at 2.) Blackwell states the purpose of the follower was to have another

person available in the event of a breakdown or accident, and the order or manner of moving the vehicles was not questioned so long as the work vehicles made it to their requisite locations. (Doc. 32, at 3-4.) Blackwell also states, "a CSX employee was permitted to use another work vehicle to be the follower of another company work vehicle thereby being able to get paid for the movement of the vehicle they are in and receive overtime pay for the follow movement at the same time." (Id. at 3.) However, CSX states, and Blackwell denies, that Busby informed T8 employees that an employee was not allowed to be a driver and a follower at the same time or for two employees to both drive work vehicles and simultaneously be each other's followers. (Id. at 5; Doc. 26-2, at 2.) Instead, Blackwell states Busby's practice was only to ensure the vehicles were moved to the correct location on time. (Doc. 32, at 6.)

**A. Events on March 15-17, 2024**

Over the weekend of March 15-17, 2024, Blackwell and another employee, Chameron McMillon, signed up for the following moves from the work location in Cartersville, Georgia to the new work location in Virginia Beach, Virginia: (1) Blackwell to move a log truck on March 15, 2024; (2) McMillon to be his follower on March 15, 2024; (3) McMillon to move a water truck on March 17, 2024; and (4) Blackwell to be his follower on March 17, 2024. (Doc. 26-2, at 2; Doc. 32, at 6.) Each move was a 12-hour drive, which qualified for 720 minutes of overtime pay and totaled 1,440 minutes for the weekend. (Doc. 26-2, at 2-3; Doc. 32, at 6, 8.)

CSX states Blackwell and McMillon submitted their timing and sequences of their vehicle moves to Foreman Tony "TP" Smith, who presented a timesheet to Busby, and Busby then submitted it to the payroll timekeeper, Joshua Fort. (Doc. 26-2, at 3.) CSX states that Blackwell and McMillon claimed 1,440 minutes of overtime pay for moving vehicles on March 15 and 17 based on this timesheet. (Id. at 2-3; Doc. 32, at 7.) However, Blackwell denies filling out a timesheet and claiming 1,440 minutes of overtime pay. (Doc. 32, at 7-8.) After Busby turned in the timesheet, Blackwell states Cato raised the discrepancy to Busby regarding Blackwell and McMillon's 1,440 minutes worked and the rest of the employees' 770 minutes worked.[2] (Doc. 32, at 9.) On March 19, 2024, Busby spoke with Blackwell and McMillon for the first time about the vehicle moves, and they said they did not move the vehicles on March 15, 2024. (Id.) Instead, they told Busby they moved both vehicles on March 17, 2024, with both employees driving work vehicles and serving as each other's followers at the same time. (Id. at 7.) Blackwell and McMillon told Busby they wanted to correct the timesheet to reflect their actual time worked, but Busby said Cato would not allow it although "CSX could allow employees to correct or adjust a time entry if it was written down wrong by TP Smith or Busby." (Id. at 8.)

---

[2] CSX states Fort flagged the difference between Blackwell and McMillon's 1,440 minutes worked and other employee's 770 minutes worked. (Doc. 26-2, at 3.)

Busby emailed Cato documenting that both vehicles were moved at the same time on March 17, 2024. (Id. at 9.; Doc. 32-4, at 1.) To allegedly avoid liability, Busby asked Blackwell and McMillon to adhere to a false version of events where Blackwell drove the log truck from Georgia to Virginia with McMillon following in his personal car on March 15, 2024, they both drove McMillon's personal car back to Georgia, and then McMillon drove the water truck to Virginia with Blackwell following on March 17, 2024. (Id.) Busby requested Blackwell and McMillon sign a statement attesting to the false version of events, but they declined based on the advice of their union representatives. (Doc. 32, at 10; Doc. 26-2, at 3.) As a result, "Busby reacted with anger and hostility." (Doc. 32, at 10.)

**B. Investigation**

On March 20, 2024, Busby removed Blackwell and McMillon from service pending an investigation and hearing to determine whether they claimed unearned pay. (Doc. 26-2, at 3; Doc. 32, at 10.) Before Blackwell's hearing, "Busby instructed Blackwell that in order to avoid discipline, he had to state that the vehicles were moved on March 15th and March 17th and Blackwell complied." (Doc. 32, at 16.) Accordingly, Blackwell falsely testified during his hearing that he drove the water truck with McMillon following in his personal vehicle on March 15, they drove back in the water truck, and then drove the water truck and the log truck with one as the driver and one as the follower on March 17. (Doc. 26-2, at

4; Doc. 32, at 11.) In response to Blackwell's testimony, Busby presented fuel records reflecting that the company card was not used to refuel the water truck on March 15 or the morning of March 16. (Doc. 26-2, at 4; Doc. 32, at 11.) The hearing attendees included Davie Bell, conducting officer; Joey Van Hoose, co-conducting officer and manager of system engineering; Busby, who was imposing the disciplinary charges; Tommy Boyd, Blackwell's union representative; and Blackwell. (Doc. 26-4, at 24-25.)

After the hearing, "Bell found that 'the claim of work Blackwell stated during the hearing was not supported by any facts or documents.'" (Doc. 32, at 16 (alterations adopted).) Bell also concluded that "Blackwell stated he did work for a period of 24 hours following a CSX water truck 600 miles and making a return trip 600 additional miles in the same CSX water truck but had no evidence to support the moves," and "the documents provided discrepancies in his statements and [were] proven to be inaccurate." (Id. at 15 (alterations adopted).) Blackwell challenges these conclusions because there was no evidence he claimed or received pay for the time CSX contends should not have been submitted. (Id.) Blackwell argues the hotel camera footage of the vehicles in Virginia Beach, Virgina and the credit card statements for gas could not show Blackwell claimed pay for time not worked. (Id. at 14-16.) Blackwell states he did not engage in fraud and dishonesty because the evidence presented at the hearing failed to "establish intentional misrepresentation of fact

that deceives or is intended to deceive another individual or entity for financial or personal gain." (Id. at 18.)

Following the investigation, Bell determined that Blackwell claimed pay for time not worked on March 15, 2024, which constituted fraud and dishonesty, in violation of CSX rules. (Id. at 14; Doc. 26-2, at 5.) Next, Chief Engineer Kenneth Spivey determined Blackwell was properly subject to termination for his misconduct in violating Rule 100.1 and the CSX Code of Ethics, and he terminated Blackwell's employment based on the hearing transcript, Bell's findings, and a consultation with CSX's labor relations department. (Doc. 26-8, at 2; Doc. 26-2, at 6; Doc. 32, at 20.) CSX's Rule 100.1 provides: "Employees must know and comply with rules, instructions, and procedures that govern their duties. They must also comply with the instructions of supervisors. When there is uncertainty, employees must . . . [c]ontact a supervisor for clarification." (Doc. 26-2, at 5; Doc. 32, at 13.) CSX's Code of Ethics states:

> Fraud and theft are crimes and cause lasting damage to our reputation as well as our bottom line. Fraud and theft are completely contrary to our culture and the Guiding Principles. We do not tolerate this activity under any circumstances by anyone working at or on behalf of CSX.
>
> Fraud is an intentional misrepresentation of fact that deceives or is intended to deceive another individual or entity for financial or personal gain . . .
>
> Some examples of workplace fraud may include:
> - Misrepresentation on timesheets or expense reports . . .
> - Dishonest accounting practices.

(Doc. 26-2, at 5; Doc. 32, at 13-14.)

CSX also conducted a hearing for McMillon's alleged violation and charged him with claiming pay for time not worked. (Doc. 26-2, at 7; Doc. 32, at 20.) McMillon admitted to only moving vehicles on March 17, and CSX gave a dismissal warning instead of termination. (Doc. 26-2, at 7-8; Doc. 32, at 21.) One month after Blackwell's hearing, Spivey issued a new policy stating that employees could not be both the driver and follower in the same work vehicle. (Doc. 32, at 17.)

**C. Protected Activity**

Blackwell alleges CSX terminated his employment in retaliation for two protected activities: (1) reporting an alleged safety issue with a tamper machine and (2) reporting that a supervisor allegedly showed up to work under the influence of alcohol. (Doc. 26-2, at 8; Doc. 32, at 21.) CSX investigated Blackwell's reports and found them to be unsubstantiated. (Doc. 26-2, at 8; Doc. 32, at 21.) Prior to making the reports, Blackwell claims Cato instructed him not to go to the ethics department, union, or human resources with problems but to instead handle the issues within their team. (Doc. 32, at 32.)

1. <u>Reporting a Safety Issue</u>

While Blackwell operated a tamper machine at work, it sometimes failed to make a level track or generally cooperate, requiring Blackwell to shut the machine down and request mechanics.

(Doc. 26-2, at 8; Doc. 32, at 22.) Blackwell reported these issues to his then-supervisor, McCarty, who would inform upper-level management through the chain of command. (Doc. 32, at 23.) However, Cato learned of the level issues with the tamper machine from reports by other supervisors, inspecting the track, and asking McCarty about it. (Doc. 26-2, at 9; Doc. 32, at 24.) Cato sent a manufacturer to inspect the machine, who found it was not calibrated properly. (Doc. 26-2, at 9; Doc. 32, at 24.) Blackwell states Cato was aware of the tamper machine issues based on conversations with McCarty. (Doc. 32, at 24.)

2. Reporting a Supervisor's Alleged Intoxication at Work

On February 28, 2024, Blackwell emailed Human Resources Manager Tiffany Stevens that he observed Assistant Director Dennis Rhodes arrive at work with alcohol on his breath, go to sleep in his personal vehicle, and then continue working. (Doc. 26-2, at 9; Doc. 32, at 25.) CSX investigated these claims; the ethics investigator interviewed Smith, Rhodes, and Cato; and two managers surveilled Rhodes for signs or symptoms to warrant reasonable suspicion for an alcohol test. (Doc. 26-2, at 9; Doc. 32, at 25.) CSX ultimately found Blackwell's claim to be unsubstantiated. (Doc. 26-2, at 9; Doc. 32, at 25.)

On February 26, 2025, Blackwell brought this action, alleging CSX violated the FRSA, which protects railroad employees from retaliation for safety-related whistleblowing. (Doc. 1, at 3-9 (citing 49 U.S.C. § 20109(a)-(c)).) On January 28, 2026, CSX filed

a motion for summary judgment. (Doc. 26.) On March 5, 2026, Blackwell responded. (Docs. 33, 34.) On March 19, 2026, CSX replied. (Doc. 37.) On March 31, 2026, Blackwell moved for leave to file a corrected declaration of Blackwell. (Doc. 42.) On March 31, 2026, CSX responded. (Doc. 43.) On March 31, 2026 Blackwell requested oral arguments. (Doc. 44.) On April 6, 2026, CSX responded. (Doc. 45.)

## II. LEGAL STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are "material" if they could "affect the outcome of the suit under the governing [substantive] law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and a dispute is genuine "if the non[-]moving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." Waddell v. Valley Forge Dental Assocs., Inc., 276 F.3d 1275, 1279 (11th Cir. 2001) (citation omitted). The Court must view factual disputes in the light most favorable to the non-moving party and must "draw all justifiable inferences in [the non-moving party's] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citation, internal quotation marks, and internal punctuation omitted). The Court should not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the Court, by reference to materials in the record, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the non-movant bears the burden of proof at trial, the movant has two options as to how it can carry its initial burden. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-16 (11th Cir. 1993). The movant may show an absence of evidence to support the nonmovant's case or provide affirmative evidence demonstrating the nonmovant's inability to prove its case at trial. Id.

If the movant carries its initial burden, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Vaughn v. Ret. Sys. of Ala. 856 F. App'x 787, 789 (11th Cir. 2021) (citation omitted). The nonmovant must tailor its response to the method by which the movant carries its initial burden. Fitzpatrick, 2 F.3d at 1116-17. For example, if the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Id. at 1116. On the other hand, if the movant shows a lack of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17 (citations omitted). The non-movant cannot carry its

burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of Court provided Plaintiff notice of the motion for summary judgment, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 27.) For that reason, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985), have been satisfied. The time for filing materials in opposition has expired, the issues have been thoroughly briefed, and the motion is ripe for consideration.

## III. DISCUSSION

The Court turns to Blackwell's motion for leave to file corrected exhibit and then CSX's motion for summary judgment.

### A. Motion for Leave to File

After the motion for summary judgment was fully briefed, Blackwell filed a notice of correction and asked the Court to disregard citations to ¶¶ 17-20 of Blackwell's declaration (Doc. 32-1) and to reference his deposition for citations to ¶¶ 15-16 of his declaration. (Doc. 39, at 1-2.) CSX objected to Blackwell's request, and Blackwell stated the citation errors resulted from him inadvertently signing and filing a previous draft of the

declaration which did not contain ¶¶ 15-20. (Doc. 40; Doc. 41, at 3; Doc. 42, at 2.) Blackwell moved to file his corrected declaration, and CSX opposed the request, claiming "further briefing is a waste of . . . resources because summary judgment is appropriate regardless of Mr. Blackwell's declaration." (Doc. 42; Doc. 43, at 2.) Blackwell submitted the corrected declaration, but he failed to sign it. (Doc. 42-2.) As a result, the Court cannot rely on it as evidence and will reference his deposition (Doc. 26-3) as initially requested. Thus, the Court **DENIES** Blackwell's motion for leave to file. (Doc. 42.)

**B. Motion for Summary Judgment**

The Court addresses Blackwell's FRSA claim and then his claim for punitive damages.

1. <u>FRSA Claim</u>

The FRSA provides whistleblower protections for railroad employees. <u>See</u> 49 U.S.C. § 20109(a)-(c). The FRSA prohibits railroad carriers from "discharg[ing], demot[ing], suspend[ing], reprimand[ing], or in any other way discriminat[ing] against an employee if such discrimination is due, in whole or in part, to" the employee participating in a protected activity. <u>Id.</u> § 20109(a). The FRSA allows enforcement actions for alleged violations of these whistleblower protections. <u>Id.</u> § 20109(d)(1). For these enforcement actions, the FRSA incorporates the standards of proof from the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR 21"). <u>Id.</u> § 20109(d)(2)(A)(i) ("Any

action brought under [49 U.S.C. § 20109](d)(1) shall be governed by the legal burdens of proof set forth in section 42121(b).”). Under the AIR 21 framework, a plaintiff bears the burden of establishing that his protected activity was a contributing factor to an adverse employment action. Id. § 42121(b)(2)(B)(iii); accord id. § 42121(b)(2)(B)(i). The Eleventh Circuit has held

> to prove a claim under the FRSA, an employee must establish by a preponderance of the evidence that (1) he engaged in a protected activity; (2) the railroad knew, actually or constructively, that he engaged in the protected activity; (3) he suffered an adverse employment action; and (4) the protected activity was a contributing factor in the adverse action.

Hitt v. CSX Transp., Inc., 116 F.4th 1309, 1315-16 (11th Cir. 2024) (citations omitted). If the plaintiff makes this showing, “the burden shifts to the employer to show by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of the protected activity.” Murray v. UBS Sec., LLC, 601 U.S. 23, 26 (2024) (internal quotation marks omitted) (quoting 49 U.S.C. § 42121(b)(2)(B)(ii)). “The framework was meant to relieve whistleblowing employees of the excessively heavy burden under then-existing law of showing that their protected activity was a significant, motivating, substantial, or predominant factor in the adverse personnel action.” Id. at 28 (internal quotation marks and citation omitted).

2. Analysis

The Court first analyzes whether Blackwell established a prima facie FRSA retaliation case by a preponderance of the

evidence, and if so, whether CSX showed by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of the protected activity.

*a. Prime Facie FRSA Case*

The Court considers the FRSA prima facie elements in turn.

i. Protected Activity

Under the FRSA, "[a] railroad carrier engaged in interstate or foreign commerce, or an officer or employee of such a railroad carrier, shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for . . . reporting, in good faith, a hazardous safety or security condition." 49 U.S.C.A. § 20109(b). CSX argues it investigated Blackwell's safety concerns and found they were unsubstantiated. (Doc. 26-1, at 9-10.) Blackwell argues his reports are still protected activity because protected activity only depends on the employee's subjective, reasonable belief the condition implicated safety. (Doc. 34, at 14.) The Court finds both of Blackwell's reports are protected activity under the FRSA.

**I. Tamper Machine Reports**

First, CSX argues the issues with the tamper machine were not properly reported on the daily inspection log, were not safety-related, and were not made to upper management. (Doc. 26-1, at 9-10.) Blackwell admitted the tamper machine could operate safely but merely took longer to do so. (Id. at 9.) Blackwell argues the tamper machine issues concerned safety because the unlevel

track could cause derailment. (Doc. 34, at 14.) Blackwell argues the presence of a safety risk is also evidenced by: (1) other supervisors' complaints about the derailment risk; (2) CSX's response to inspect the track and send a manufacturer for repair; and (3) Cato blaming Blackwell and his team for low production due to the tamper machine's issues. (Id. at 15-16.)

The Court finds Blackwell's reports that the tamper machine was leaving unlevel track and not working properly relate to a hazardous safety issue and are protected activity. Cato stated the tamper machine's unlevel track could cause derailment due to one rail rising two inches higher than the other when both should be even and flat. (Doc. 34, at 14; Doc. 26-7, at 8.) The Court finds the risk of derailment is a hazardous safety condition. Head v. Norfolk S. Ry. Co., 2:15-CV-02118, 2017 WL 4030580, at *15 (N.D. Ala. Sept. 13, 2017). Thus, Blackwell's actions of reporting the tamper machine's issues were protected.

**II. Rhodes's Intoxication Report**

As for Blackwell reporting Rhodes's intoxication, CSX argues an ethics investigator and two managers conducted a thorough investigation and found Blackwell's claims unsubstantiated. (Doc. 26-1, at 10-11.) Blackwell argues his observations of Rhodes stumbling, smelling like alcohol, making a strange facial expression, and lying down in his truck provided a reasonable basis for believing he may have been impaired. (Doc. 34, at 16-17.) Blackwell argues that even if CSX found his report unsubstantiated,

he still acted based on his good-faith belief at the time. (Id. at 17.)

The Court finds Blackwell's report that Rhodes was intoxicated at work constitutes protected activity. Blackwell personally observed Rhodes and reasonably suspected that he may be under the influence of alcohol. Intoxicated employees present a danger and risk of safety especially working for a railroad company. Thus, the Court finds Blackwell has proved his actions constitute protected activity.

ii. Knowledge of Protected Activity

CSX argues Spivey, the decision-maker of Blackwell's termination, did not know of Blackwell's protected activity. (Doc. 26-1, at 13.) CSX argues Blackwell admitted during his deposition that he had no evidence that Spivey knew of his tamper machine and intoxication reports before deciding to terminate him. (Id.; Doc. 26-3, at 32.) Blackwell does not argue Spivey knew about the protected activity. (Doc. 34, at 17.) Instead, Blackwell argues that the knowledge element is satisfied based on Cato's actual knowledge as the process initiator under (1) the FRSA and (2) cat's paw liability. (Id. at 17-20.)

**I. Knowledge under FRSA**

An FRSA retaliation plaintiff "must establish that the decision-makers who subjected him to the alleged adverse action were aware of the protected activity." Rudolph v. Nat'l R.R. Passenger Corp., ARB Case No. 11-037, 2013 WL 1385560, at *9 (Mar.

29, 2013); see also Singleton v. Pub. Health Tr., 725 F. App'x 736, 738 (11th Cir. 2018) ("To make a prima facie showing of causation, [the plaintiff] was required to show . . . the decision-makers were aware of the protected conduct." (alterations adopted) (internal quotation marks and citations omitted)); Conrad v. CSX Transp., Inc., 824 F.3d 103, 108 (4th Cir. 2016) ("The 'knowledge' relevant for a retaliation claim under the FRSA must be tied to the decision-maker involved in the unfavorable personnel action."); Kuduk v. BNSF Ry. Co., 768 F.3d 786, 791 (8th Cir. 2014) (finding that a plaintiff failed to satisfy the knowledge element of his FRSA retaliation claim when the decision-makers had no knowledge of his protected activity); Highsmith v. CSX Transp., Inc., No. 5:22-CV-52, 2024 WL 3164660, at *6 (S.D. Ga. June 24, 2024) (holding a jury could find the knowledge element was satisfied where the defendant's employee instigated the disciplinary proceeding against plaintiff, took part in deciding to fire the plaintiff, and knew that plaintiff had previously reported injuries). A plaintiff satisfies this requirement by showing that the decision-maker had actual or constructive knowledge of his protected activity. See Kuduk, 768 F.3d at 790; see also 29 C.F.R. § 1982.104(e)(2). Moreover, the ARB has added that it is "insufficient" to "demonstrat[e] that an employer, as an entity, was aware of the protected activity." Rudolph, 2013 WL 1385560, at *9; see also Kuduk, 768 F.3d at 790-91 (a lower-level supervisor's knowledge was not sufficient where the "decision-

makers had no knowledge — actual or constructive — of [the employee's] protected activity").

First, Blackwell argues Cato had actual knowledge of the reports of Rhodes's intoxication and the tamper machine. (Doc. 34, at 17.) Blackwell argues CSX admits Cato knew of the reports in its answer, and Cato also knew of the reports based on various track supervisors' complaints to him about the bad track. (Id.) Blackwell also argues Cato "attributed [the] problems to operator error by Blackwell" after learning about the tamper machine issues and speaking with McCarty. (Id.) Second, Blackwell argues "Cato initiated and orchestrated the entire [termination] process." (Id. at 18.) Blackwell argues Cato questioned his overtime hours on the timesheet for the first time, denied employees the ability to correct timesheets although doing so was standard practice, and directed Busby to initiate discipline and remove Blackwell from service. (Id.) Blackwell argues the fact "[t]hat Spivey ultimately made the termination decision based on the hearing record Cato orchestrated . . . does not insulate CSX from liability." (Id.) CSX responds that Blackwell lacks evidence of decision-maker knowledge or that Busby or Fort, the timekeeper, knew of his protected activities. (Doc. 37, at 3.)

The Court finds no evidence that Spivey, the decision-maker responsible for Blackwell's termination, "knew, actually or constructively, that he engaged in the protected activity." Hitt, 116 F.4th at 1315-16. Blackwell admits he has no evidence that

Spivey had any knowledge of his protected activity. (Doc. 32, at 20; Doc 26-3, at 32.) As such, the Parties' disagreement lies in whether the knowledge requirement may extend beyond Spivey to Cato, as a manager with an alleged retaliatory motive involved in Blackwell's disciplinary proceedings.

Blackwell and McMillon's declarations stated that Cato initiated and communicated with Busby during the investigation of the timesheets and was responsible for Blackwell's removal from service. (Doc. 32, at 9; Doc. 32-1 at 5; Doc. 32-2, at 8.) Blackwell cites Conrad to support his argument that an individual with knowledge of a protected activity who participated in the unfavorable personnel action can satisfy the knowledge requirement even without decision-maker knowledge. (Doc. 34, at 17 (citing 824 F.3d at 109).) But Conrad found the plaintiff could not satisfy the knowledge element of his FRSA retaliation claim without sufficient evidence that the decision-makers knew of his protected activity or by showing that a person with knowledge had a role in the disciplinary charges. 824 F.3d at 108. Beyond Blackwell and McMillon's testimony that Cato orchestrated the disciplinary charges that Busby imposed, there is no evidence Cato was part of the disciplinary hearing. Blackwell cites Busby's deposition to show Cato's involvement, but Busby states Fort noticed and flagged Blackwell's excessive hours to Busby after he submitted them, and then Busby called Cato, informed him about the excessive hours, and asked how to handle the situation. (Doc. 34, at 18; Doc. 26-

5, at 6.) Cato was also not present at the hearing, and there is no evidence Blackwell's protected activity was disclosed or introduced at the disciplinary hearing. (Doc. 26-4, at 24-25.)

The Court finds Blackwell's evidence of Cato's involvement in the disciplinary hearing cannot satisfy knowledge under the FRSA. Spivey declared under oath that his decision to terminate Blackwell's employment had no relation to his safety reports, and Blackwell has produced no evidence to challenge Spivey's sworn statements. (Doc. 26-8, at 3.) Blackwell has also failed to show Cato's involvement in the disciplinary hearing itself or the disciplinary investigation beyond self-serving declarations. Thus, the Court finds FRSA knowledge is not satisfied and turns to Blackwell's cat's paw liability theory.

**II. Knowledge under Cat's Paw Liability**

The Supreme Court held that "if a supervisor performs an act motivated by [retaliatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." Staub v. Proctor Hosp., 562 U.S. 411, 422 (2011). "Cat's paw liability applies in FRSA retaliation cases." Highsmith, 2024 WL 3164660, at *6 (citing Hitt, 672 F. Supp. 3d 1192, 1203-05 (N.D. Ala. 2023); Kuduk, 768 F.3d at 790-91; Lowery v. CSX Transp., Inc., 690 F. App'x 98, 100 (4th Cir. 2017)). "Regardless of whether the decision-makers possessed direct knowledge of [the plaintiff's] protected activities, knowledge may

be tied to all three decision-makers through [the plaintiff's supervisor] under the cat's paw theory." Lowery, 690 F. App'x at 100 (citations omitted). The Supreme Court further explained: "[I]f the independent investigation relies on facts provided by the biased supervisor — as is necessary in any case of cat's-paw liability — then the employer (either directly or through the ultimate decisionmaker) will have effectively delegated the factfinding portion of the investigation to the biased supervisor." Staub, 562 U.S. at 421. In this way, an independent investigation that does not delegate fact-finding cuts off the causal relationship between the supervisor's biased investigation and the termination. (Id.)

Blackwell argues that even if the Court finds only the final decision-maker's knowledge satisfies the element, cat's paw liability applies. (Doc. 34, at 18-20.) Blackwell asserts the requirements for cat's paw liability are met: (1) Cato was a supervisor who performed an act motivated by retaliatory animus because he knew of Blackwell's protected activity and took unusual action to investigate the timesheets, refuse corrections, and direct disciplinary action; (2) Cato's actions intended to cause an adverse action by directing Busby to remove Blackwell from service and enforce disciplinary charges; and (3) causation because Spivey's decision to terminate Blackwell was based on the hearing transcript and findings that were initiated and developed by Cato. (Id. at 19.) Blackwell further argues Spivey's reliance

on the hearing findings is not an independent investigation because Spivey knew the rule that Blackwell was charged for violating did not exist at the time and Blackwell did not violate it. (Id.) Finally, Blackwell asserts Spivey officially implemented the rule the month after Blackwell's termination. (Id. at 20.)

CSX argues Blackwell merely relies on "his own self-serving declaration and the declaration of . . . McMillon" without other evidence that Cato orchestrated his discipline. (Doc. 37, at 3.) Further, CSX argues Blackwell cites Busby's deposition testimony, but Busby specifically testified that Fort flagged the timesheet issue, not Cato. (Id. at 4.) Busby testified that he then informed Cato about the issue, who told Busby to do whatever was best and document all conversations. (Id.) CSX asserts Cato "had nothing to do with Busby's decision to remove Plaintiff from service or schedule the pre-disciplinary hearing." (Id.) It argues there is no evidence Cato discussed Blackwell's protected activities with Fort, Busby, Bell, or Spivey. (Id.)

The Court finds Blackwell fails to show a genuine dispute of material fact that Cato's retaliatory motive and involvement in his disciplinary hearing sufficiently satisfies the knowledge element. Under the cat's paw liability theory, CSX could still be liable if Cato was motivated by a retaliatory animus, intended to cause an adverse employment action by initiating Blackwell's disciplinary investigation, and his involvement was the basis of Spivey's decision to terminate Blackwell. Staub, 562 U.S. at 421.

If the hearing did not rely on facts provided by Cato, then the hearing was a sufficiently independent investigation and cannot satisfy the knowledge requirement under cat's paw liability. See Waters v. Ga. Dep't of Juv. Just., 181 F. Supp. 3d 1226, 1236 (S.D. Ga. 2016).

Viewing Blackwell's evidence in the light most favorable to him and even assuming *arguendo* Cato had a retaliatory motive that incited Busby to conduct the disciplinary hearing, the hearing was conducted completely independent of Cato's involvement. Cato was not present for the hearing. (Doc. 26-4, at 93.) The hearing transcript lacks any indication of Cato's alleged retaliatory animus - the facts presented were related to Blackwell's actions toward Busby, Smith, and Fort. (Id. at 22-92.) Nor is there any evidence Cato, Busby, or Fort informed Bell or Spivey of Blackwell's protected activity. Based on the disciplinary hearing, Hearing Officer Bell made findings and conclusions that Spivey relied on in deciding to terminate Blackwell's employment. (Doc. 26-8, at 2.) In Spivey's declaration, he states: (1) he based his decision to terminate Blackwell only on the "investigation hearing transcript and exhibits, Hearing Officer Davie Bell's Findings, and the recommendation of Labor Relations Manager John Ingoldsby"; (2) he terminated Blackwell for "violat[ing] Rule 100.1 and the CSX Code of Ethics, which prohibits dishonesty, fraud and the misrepresentation of timesheets; (3) he "concluded [Blackwell's] testimony was dishonest"; and (4) his

"decision to terminate [Blackwell's] employment had no relation to any alleged safety reports made by [him]." (Doc. 26-8, at 2-3.) Because Spivey conducted his own evaluation and Bell made independent findings, cat's paw liability does not apply.

Blackwell's other arguments on Cato's alleged influence over Busby are insufficient to create a genuine dispute of material fact that Cato influenced the hearing with retaliatory animus. Blackwell stated Cato "took unusual actions [such as] unprecedented scrutiny, refusal to allow time corrections, [and] directing discipline." (Doc. 34, at 19.) Further, Blackwell argues Spivey knew the rule on moving vehicles did not exist and Busby instructed him to lie during the hearing, but he solely relies on his own deposition and declaration to support these arguments. (Id. at 10, 19-20.) Blackwell lacks any corroborating evidence that Cato first noticed the timesheet discrepancy, told Busby to deny timesheet corrections and charge Blackwell, or made up the rule on moving vehicles. Even assuming Busby instructed Blackwell to lie to save their jobs, one of Spivey's stated reasons for termination — dishonesty — would still apply. (Doc. 32, at 14; Doc. 26-8, at 2.) Busby also testified during the disciplinary hearing that it was his sole decision to charge Blackwell. (Doc. 26-4, at 42-43.) Busby testified that he turned in the timesheet, Fort flagged Blackwell's excessive hours to him, prompting Busby to ask Blackwell if the hours were correct, and only then did Busby bring the issue to Cato's attention, who told him to do what he

thought was best. (Doc. 26-5, at 6.) Accordingly, Blackwell failed to create a genuine issue that Cato's alleged retaliatory animus was intended to cause his termination or was a proximate cause of his termination. Thus, the Court finds there is no genuine dispute of material fact for knowledge for Blackwell's prima facie case.

*c. Adverse Employment Action*

CSX makes no mention as to whether Blackwell suffered an adverse employment action, so the Court finds this element undisputed. Blackwell argues not only was his termination an adverse employment action, but he also suffered additional adverse employment actions of removal from service, disciplinary violations, and a formal disciplinary investigation. (Doc. 34, at 20.) The Court finds Blackwell's termination qualifies as an adverse employment action under § 20109(b).

*d. Causation*

A protected activity is a contributing factor in an adverse action if it, "alone or in combination with other factors, tends to affect in any way the outcome of the decision." Araujo v. New Jersey Transit Rail Operations, Inc., 708 F.3d 152, 158 (internal quotation marks omitted) (quoting Ameristar Airways, Inc. v. Admin. Rev. Bd., 650 F.3d 562, 563, 567 (5th Cir. 2011)); see also Boatright v. CSX Transp., Inc., No. 5:21-CV-28, 2023 WL 4548280, at *11 (S.D. Ga. July 14, 2023). "The protected activity need only play some role, and even an 'insignificant' or 'insubstantial'

role suffices." Palmer v. Canadian Nat'l Ry./Ill. Cent. R.R. Co., ARB Case No. 16-035, 2016 WL 5868560, at *31 (Dep't of Lab. Sept. 30, 2016) (alterations adopted) (citations omitted).

An employee's protected conduct is a "contributing factor" to an adverse action "[w]hen an employer treats someone worse – whether by firing them, demoting them, or imposing some other unfavorable change in the terms and conditions of employment – 'because of' the employee's protected [ ] activity." Murray, 601 U.S. at 34-35. To meet the contributing factor standard, a plaintiff need not prove that his employer acted with "retaliatory intent," which is treated as "something akin to animus." Id. at 32-33. Instead, the employee must prove its employer's "intent to take some adverse employment action against the [ ] employee 'because of' his protected [ ] activity." Id. at 35. In other words, the employer must have made "an intentional choice in which that factor played some role in the employer's thinking." Id. at 40 (Alito, J., concurring).

Ultimately, Blackwell "bears the burden to prove that his protected activity 'was a contributing factor in the unfavorable personnel action alleged in the complaint,' 49 U.S.C. § 42121(b)(2)(B)(i), but he is not required to make some further showing that his employer acted with 'retaliatory intent.'" Id. at 39.

Blackwell may prove his protected activity was a contributing factor by circumstantial evidence, including:

> [1] temporal proximity, [2] indications of pretext, [3] inconsistent application of an employer's policies, [4] an employer's shifting explanations for its actions, [5] antagonism or hostility toward a complainant's protected activity, [6] the falsity of an employer's explanation for the adverse action taken, and [7] a change in the employer's attitude toward [the plaintiff] after he or she engages in protected activity.

Highsmith, 2024 WL 3164660, at *4 (citation omitted).

CSX argues Blackwell purely relies on speculation and assumption instead of evidence that his safety reports were connected to his termination. (Doc. 26-1, at 14.) First, CSX argues Blackwell's attempt to show disparate treatment fails. (Id. at 14-15.) It asserts McMillon was not a similarly situated employee because he was truthful and accepted responsibility during his disciplinary hearing and was not not terminated unlike Blackwell, who lied during his disciplinary hearing and was terminated. (Id. at 15.) Next, CSX argues it acted in good faith, exercised its reasonable business judgment in investigating Blackwell's misconduct, and terminated Blackwell after finding he violated company rules against theft, fraud, and dishonesty. (Id. at 16.) CSX argues its decision was supported by fuel records, hotel records, and other evidence presented at Blackwell's hearing that showed he did not work on March 15. (Id. at 17.) Finally, CSX argues Blackwell's intervening fraud and dishonesty severs any potential causal connection based on temporal proximity between his alleged safety reports and his termination. (Id.) After

Blackwell's protected conduct, he claimed pay for time not worked and lied during his investigation hearing. (Id. at 18.)

Blackwell argues his protected activity was a contributing factor to his termination, and he need not prove CSX acted with a retaliatory intent. (Doc. 34, at 21.) First, Blackwell argues the temporal proximity between his intoxication report on February 28, 2024, his disciplinary charges and removal from service on March 20, 2024, and his hearing in April 2024 demonstrates his protected activity was a contributing factor. (Id. at 22.) CSX argues that without decision-maker knowledge, proximate timing is not relevant. (Doc. 37, at 5.)

Second, Blackwell argues CSX deviated from standard practice by treating him differently from another employee. (Doc. 34, at 22.) Blackwell asserts CSX showed special animus towards him based on Cato's heighted scrutiny concerning the vehicle moves and refusal of timesheet corrections, which was generally permitted. (Id. at 22-23.) CSX argues Blackwell's only evidence that it would pay employees for working both as a driver and follower is his own declaration and McMillon's declaration. (Doc. 37, at 5.) Even if employees were allowed double pay, CSX argues Blackwell still claimed pay for time not worked, lied at his disciplinary hearing, and was terminated as a result. (Id.) Further, CSX argues Blackwell cannot show Busby knew or allowed double pay for others during the time he was Blackwell's supervisor, and thus, treated Blackwell differently. (Id. at 6.)

Third, Blackwell argues CSX's rule that a driver could not also be a follower did not exist during his alleged violation. (Doc. 34, at 23.) Blackwell asserts CSX issued its first written policy on this rule about a month after the hearings, which shows it did not previously exist. (Id.) CSX argues regardless of "whether there was a rule, policy, or instruction regarding driver-follower movements, [Blackwell] admits he claimed pay for time worked on March 15 but did not actually perform any work that day." (Doc. 37, at 6-7.) Nonetheless, CSX argues it has "a written rule [for when] employees are unclear about rules, policies, or procedures" that directs them to "[c]ontact a supervisor for clarification." (Id. at 7.) Finally, CSX argues the fact that it reaffirmed the driver-follower instructions in a written policy does not support Blackwell's argument because he admitted that employees were subject to termination for claiming pay for time not worked and dishonesty. (Id.)

Fourth, Blackwell argues he and McMillion engaged in identical conduct but received different disciplinary consequences. (Doc. 34, at 23.) Although McMillion also served as a driver and follower in a work vehicle, was charged with the same violations, and had disciplinary hearings, Blackwell argues McMillon was treated differently because he received a warning instead of a termination. (Id.) CSX argues it is undisputed that Blackwell lied at his hearing, which is clearly distinguishable from McMillon, making the circumstances not similar in all material

aspects. (Doc. 37, at 8.) Until the hearings, Blackwell and McMillon were treated the same and given an opportunity to write down the events that occurred, prohibited from correcting the timesheets, removed from service, and provided a hearing to explain what happened. (Id.)

The Court examines Blackwell's circumstantial evidence and considers whether his protected activity "played some role in the employer's thinking." Hitt, 116 F.4th at 1316 (citation omitted). Although Blackwell argues the circumstances of his termination were retaliatory, a jury would merely be speculating if it were to conclude that he was terminated because of his protected activity.

First, the temporal proximity from Blackwell's reports[3] to his removal from service and eventual termination could indicate the protected activity was a contributing factor. Blackwell reported the intoxication on February 28, 2024; was removed from service on March 20, 2024; and was terminated after the April 9, 2024 hearing. (Doc. 34, at 22.) Although the temporal proximity is significant, the proximity of these events is intercepted by Blackwell's discrepancy on the timesheet and untruthful testimony during his disciplinary hearing. It is also undisputed that Spivey did not know of Blackwell's protected activity. Despite the temporal proximity, a reasonable jury could not infer that

[3] Blackwell states his safety reports regarding the tamper machine were before CSX's adverse actions of removing Blackwell from service and termination, but the Parties' SUMF fails to allege the date Blackwell first reported the tamper machine. (Doc. 32, at 22-23.)

Blackwell's protected activity contributed, in any way, to his termination without evidence that Bell or Spivey knew of Blackwell's protected activity. See Ziparo v. CSX Transp., Inc., 160 F.4th 314, 344 (2d Cir. 2025) (finding plaintiff's protected activity contributed to his termination where the employees were either hostile to plaintiff due to his safety complaints or knew of his complaints and were involved in his termination process with one serving as the charging offer at his disciplinary hearing).

Similarly, the disciplinary hearing and termination lacked any indication of pretext because Bell conducted a fair, independent hearing, and Spivey relied on his findings in deciding to terminate Blackwell's employment. Blackwell was represented by a union representative at the hearing and was provided the opportunity to introduce evidence or testimony. (Doc. 32, at 11.) He lacks evidence to support that CSX did not truly believe he violated the charges against him and only terminated him because of pretext. Even assuming Cato had retaliatory intent, scrutinized Blackwell's vehicle moves more than others, and did not allow him to correct his timesheet, there is insufficient evidence to show this alleged pretext affected his disciplinary hearing or was a contributing factor to his termination.

Although Blackwell argues McMillon was treated differently, the Court finds they did not engage in identical conduct and cannot be deemed similarly situated comparators. Blackwell's termination

was partially due to his lie during the hearing. (Doc. 26-8, at 2.) McMillon told the truth, so CSX did not terminate him. (Doc. 37, at 8.) The Court finds lying during the hearing affects the "quantity and quality of the comparator's misconduct" so as to not make it "nearly identical" even though Blackwell and McMillon's behavior was substantially similar until then. Stone & Webster Constr., Inc. v. U.S. Dep't of Lab., 684 F.3d 1127, 1135 (11th Cir. 2012) (citation omitted). Thus, a reasonable jury could not find their differing disciplinary consequences was due to Blackwell's protected activity when Blackwell gave false testimony and McMillon was truthful.

As for the alleged inconsistent application of the policy on moving work vehicles, both Parties present evidence on whether the driver and follower rule was inconsistently applied against Blackwell. Blackwell's declaration states "CSX [previously] approve[d] and pa[id] employees for 'follow pay' in addition to 'driver pay' for fulfilling the two jobs in one trip," and Busby never told him that was not allowed. (Doc. 32-1, at 3, 5.) Blackwell's only other evidence is a declaration from McMillon. (Doc. 32-2, at 5.) On the other hand, Busby testified that "everybody was under the same understanding" regarding this rule. (Doc. 26-5, at 8.) Busby stated "everybody knew that you had to sign up [to be] a driver for this. You had to have a follower bring your vehicle or their vehicle and then bring you back." (Id.) Busby also testified that the follower is supposed to drive

their personal vehicle and cannot be paid for simultaneously being a driver of a work vehicle. (Doc. 26-6, at 85, 91-92.) Thus, the Court finds there is no genuine dispute of material fact as to how this rule was applied because Blackwell's only evidence that an employee could simultaneously be a driver and a follower is his and McMillon's declarations. (Doc. 32-1, at 3; Doc. 32-2, at 3.)

The evidence establishes Blackwell engaged in protected activity by reporting the tamper machine safety issues and Rhodes's intoxication and that he suffered an adverse action of termination. But there is no evidence these actions were contributing factors to his termination. There is no evidence to find that Blackwell's protected activity played a role in Spivey's decision to terminate him. As such, the Court finds Blackwell failed to prove the knowledge and causation elements of a prima facie claim, so Blackwell has failed to establish a genuine dispute of material fact for his FRSA claim. The Court need not turn to the burden-shifting analysis or consider whether CSX showed that it "would have taken the same employment actions even in the absence of Plaintiff's protected activity."[4] Grantham v. CSX Transp., Inc., No. CV 219-065, 2022 WL 677575, at *6 (S.D. Ga. Mar. 7, 2022) (citation omitted). Therefore, CSX's motion for summary judgment is **GRANTED** as to Blackwell's FRSA claim.

[4] To prove it would have taken the same employment action absent Blackwell's protected activity, CSX submitted various termination letters for dishonest conduct and falsifying payroll entries to claim pay for time not worked. (Doc. 26-6, at 135-36, 138-39, 141, 143, 145, 147.)

3. Punitive Damages

Finally, CSX argues that it is entitled to summary judgment on Blackwell's claim for punitive damages. "The purpose of punitive damages, both in the FRSA and elsewhere, is twofold: 'to punish [a wrongdoer] for his outrageous conduct and to deter him and others like him from similar conduct in the future.'" Pan Am Rys., Inc. v. U.S. Dep't of Lab., 855 F.3d 29, 38 (1st Cir. 2017) (quoting Smith v. Wade, 461 U.S. 30, 54 (1983)). "[P]unitive damages are warranted if a railroad acted 'with malice or ill will or with knowledge that its actions violated federal law or with reckless disregard or callous indifference to the risk that its actions violated federal law.'" Id. (alteration adopted and citation omitted).

CSX argues Blackwell cannot show it "acted with malice or ill will, with knowledge that its actions violated federal law, or with reckless disregard or callous indifference to the risk that its actions violated federal law." (Doc. 26-1, at 22 (citing Head v. Norfolk S. Ry. Co., No. 2:15-cv-2118, 2017 WL 4030580, at *18 (N.D. Ala. Sept. 12, 2017)).) CSX argues Blackwell provided false testimony at his investigation hearing and to the Occupational Safety and Health Administration in an underlying administrative proceeding, so punitive damages are not appropriate. (Id.) Further, CSX argues it took Blackwell's reports seriously and promptly investigated his claims. (Id. at 23.) Blackwell argues the punitive damages claim should proceed "based on the lengths

that Busby, Cato and Bell went to cover-up retaliation, try to get Blackwell to sign a false report, knowingly submit false time on Blackwell's behalf, refuse to correct the time, and withhold key evidence that would expose the façade." (Doc. 34, at 24.)

It is clear from the record there is no evidence to support a claim for punitive damages. Blackwell fails to show CSX "consciously disregarded [his] statutorily-protected rights under the FRSA." Pan Am Rys., 855 F.3d at 38. CSX received and investigated Blackwell's reports regarding the tamper machine and Rhodes's intoxication. (Doc. 32, at 24-25.) As such, CSX's motion for summary judgment is **GRANTED** on this claim.

## IV. CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that Defendant's motion for summary judgment (Doc. 26) is **GRANTED**, Plaintiff's motion for leave to file corrected exhibit declaration (Doc. 42) is **DENIED**, and Plaintiff's motion for oral arguments (Doc. 44) is **DENIED**. The Clerk is **DIRECTED** to **ENTER JUDGMENT** in favor of Defendant, **TERMINATE** all pending motions and deadlines, and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this 17th day of September, 2026.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA